RECORD NO. 22-2106

In The

# United States Court of Appeals

### For The Fourth Circuit

**SUSAN K. CARPENTER,**
**Trustee for H. Joe King, Jr. Revocable Trust,**
**on behalf and itself and all other similarly situated,**

*Plaintiff – Appellant,*

v.

**WILLIAM DOUGLAS MANAGEMENT, INC.;**
**NEXTLEVEL ASSOCIATION SOLUTIONS, INC.,**
**d/b/a HomeWiseDocs.com,**

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## AT CHARLOTTE

───────────

### BRIEF OF APPELLANT

───────────

Mark R. Sigmon
Scott C. Harris
Patrick M. Wallace
Jeremy R. Williams
MILBERG COLEMAN BRYSON
   PHILLIPS GROSSMAN, PLLC
900 West Morgan Street
Raleigh, North Carolina 27603
(919) 600-5003

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-2106     Caption: Susan K. Carpenter v. William Douglas Management, Inc. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Susan K. Carpenter
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?    ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
   If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Scott C. Harris                      Date:      11/01/2022

Counsel for: Plaintiff

- 2 -

Print to PDF for Filing

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................... v

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 3

ISSUE PRESENTED FOR REVIEW ......................................................... 3

STATEMENT OF THE CASE ..................................................................... 4

    I.    In North Carolina, A Homeowner Cannot Sell a House Governed by an HOA Without a Statement of Unpaid Assessments ........................................................................... 4

    II.    William Douglas Performs Services for HOAs, Including Providing Statements of Unpaid Assessments ..................... 5

    III.    Defendants Jointly Provide Statements of Unpaid Assessments ....................................................................... 6

    IV.    Defendants' Resale Fees are Unreasonable ........................... 7

    V.    The District Court Dismissed Carpenter's Complaint ........... 9

SUMMARY OF ARGUMENT ................................................................. 10

ARGUMENT ........................................................................................... 12

    Standard of Review ..................................................................... 12

    Discussion .................................................................................... 13

I.     CARPENTER STATED A CLAIM FOR VIOLATION OF NORTH CAROLINA'S TRANSFER FEE PROHIBITION ACT ...................... 13

    A.    The fees collected by Defendants are "transfer fees" under the plain meaning of Chapter 39A ....................................................... 15

        1.    Defendants' fees are "payable upon the transfer of interest in real property." ........ 17

            i.    The Amended Complaint alleges sufficient facts that the Resale Fees were payable upon closing, which is upon a transfer of interest in real property .................. 17

            ii.    The district court's interpretation is based on flawed reasoning ............ 18

            iii.    Defendants' conception of "transfer of real property" is too narrow ............................................... 23

        2.    Defendants' fees are paid "for the right to make [a] transfer" of real property ........ 26

        3.    Defendants admitted that their fees are "transfer fees" under Chapter 39A ...... 28

        4.    The district court's interpretation completely ignores the exception for "reasonable" statement fees, rendering it surplusage ............................................... 29

        5.    *Fleming* is not binding, directly applicable to this case, or persuasive ........ 34

B.   Chapter 39A applies to "transfer fees," not just "transfer fee covenants." ............................. 38

    1.   The plain text of Chapter 39A shows that it applies to transfer fees ................... 39

    2.   The legislative history does not contradict the plain text, which is controlling anyhow .................................... 43

C.   Carpenter sufficiently pleaded that the Resale Fees here were not reasonable ............... 44

II.   CARPENTER STATED A CLAIM FOR VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT .......... 47

A.   Defendants' actions are "unfair" under the UDTPA .............................................. 49

    1.   Defendants' practices are unfair because sellers must pay the fee in order to be able to sell their property, and they have no choice whom to pay or how much to pay ........................................ 53

    2.   Defendants' practices are unfair because they violate the public policy against restraints on the sale of real property ........................................ 54

    3.   Defendants' practices are unfair because the fees are excessive and disproportionate to the work required ...... 57

B.   Carpenter was injured by the forced payment of the Resale Fees ................................ 61

III.  CARPENTER STATED A CLAIM FOR UNJUST
      ENRICHMENT ............................................................. 62

IV.   CARPENTER STATED A CLAIM FOR
      VIOLATION OF THE NORTH CAROLINA
      DEBT COLLECTION ACT, NEGLIGENT
      MISREPRESENTATION, AND CIVIL
      CONSPIRACY ............................................................ 64

      A.  Carpenter stated a claim that Defendants
          violated the North Carolina Debt Collection
          Act ................................................................... 64

      B.  Carpenter stated a claim for negligent
          misrepresentation ............................................. 65

      C.  Carpenter stated a claim for civil conspiracy ..... 66

CONCLUSION ................................................................... 67

REQUEST FOR ORAL ARGUMENT ................................... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Ashcroft v. Iqbal,*
　　556 U.S. 662 (2009) ........................................................ 13

*Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.,*
　　665 S.E.2d 478 (N.C. Ct. App. 2008) ............................. 62

*BedRoc Ltd., LLC v. United States,*
　　541 U.S. 176 (2004) ........................................... 30, 31, 33

*Bell Atlantic Corp. v. Twombly,*
　　550 U.S. 544 (2007) ........................................................ 12

*Bethania Town Lot Comm. v. City of Winston-Salem,*
　　486 S.E.2d 729 (N.C. Ct. App. 1997), *aff'd,*
　　502 S.E.2d 360 (N.C. 1998) ........................................... 41

*Boyd v. Drum,*
　　501 S.E.2d 91 (N.C. Ct. App. 1998), *aff'd,*
　　511 S.E.2d 304 (1999) .................................................... 66

*Broad St. Clinic Found v. Weeks,*
　　848 S.E.2d 224 (N.C. Ct. App. 2020) ............................. 15

*Bumpers v. Community Bank. of Northern Virginia,*
　　747 S.E.2d 220 (N.C. 2013) ................................... *passim*

*Collins v. Davis,*
　　315 S.E.2d 759, *aff'd,*
　　321 S.E.2d 892 (1984) .................................................... 62

*Dernoshek v. FirstService Residential, Inc.*,
 No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Sept. 23, 2022),
 partially vacated on other grounds upon reconsideration,
 *Dernoshek v. FirstService Residential, Inc.*,
 No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Dec. 8, 2022)...... 38, 60, 61

*Domestic Elec. Serv., Inc. v. City of Rocky Mount*,
 203 S.E.2d 838 (N.C. 1974) ....................................................... 29, 31

*First Atl. Mgmt. Corp. v. Dunlea Realty Co.*,
 507 S.E.2d 56 (N.C. Ct. App. 1998)................................................. 51

*Fleming v. Cedar Management Group*,
 866 S.E.2d 919,
 2022 WL 29786 (N.C. Ct. App. Jan. 4, 2022)......................... *passim*

*Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*,
 80 F.3d 895 (4th Cir. 1996) ...................................................... 49, 50

*Gray v. N.C. Ins. Underwriting Ass'n*,
 529 S.E.2d 676 (N.C. 2000) ............................................................ 55

*Guyton v. FM Lending Servs., Inc.*,
 681 S.E.2d 465 (2009).................................................................... 65

*Harrington Mfg. Co. v. Powell Mfg. Co.*,
 248 S.E.2d 739 (N.C. Ct. App. 1978), *review denied*,
 251 S.E.2d 469 (1979).................................................................... 49

*Johnson v. Phoenix Mut. Life Ins. Co.*,
 266 S.E.2d 610 (N.C. 1980) ...................................................... 50, 51

*Lokhova v. Halper*,
 995 F.3d 134 (4th Cir. 2021) ......................................................... 13

*Marshall v. Miller*,
 276 S.E.2d 397 (N.C. 1981) ........................................................... 48

*Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*,
   2003 WL 22872490 (N.C. Bus. Ct. Dec. 3, 2003) ........................... 51

*Mylan Labs., Inc. v. Matkarim*,
   7 F.3d 1130 (4th Cir. 1993) ................................................. 12, 18, 19

*Noble v. Hooters of Greenville (NC), LLC*,
   681 S.E.2d 448 (N.C. Ct. App. 2009) ...................................... 54-55

*Owens v. Pepsi Cola Bottling Co. of Hickory*,
   412 S.E.2d 636 (N.C. 1992) ...................................................... 51

*Patel v. Stone*,
   531 S.E.2d 879 (N.C. Ct. App. 2000) ..................................... 15, 20

*Porsh Builders, Inc. v. City of Winston-Salem*,
   276 S.E.2d 443 (N.C. 1981) ........................................................ 29

*Ray v. North Carolina Dept. of Transp.*,
   727 S.E.2d 675 (N.C. 2012) ........................................................ 45

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ..................................................................... 15

*Roybal v. Raulli*,
   832 S.E.2d 202 (N.C. Ct. App. 2019) ..................................... 15, 20

*S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*,
   284 F.3d 518 (4th Cir. 2002) ...................................................... 53

*Sanderson v. Rice*,
   777 F.2d 902 (4th Cir. 1985) ...................................................... 35

*State v. Green*,
   514 S.E.2d 724 (N.C. 1999) ........................................................ 45

*Suarez v. Camden Prop. Tr.*,
   818 F. App'x 204 (4th Cir. 2020) ................................................ 45

*Thompson v. Ciox Health, LLC,*
  52 F.4th 171 (4th Cir. 2022)........................................................61

*United Labs., Inc. v. Kuykendall,*
  370 S.E.2d 375 (N.C. 1988) .......................................................47

*Walker v. Fleetwood Homes of N. Carolina, Inc.,*
  627 S.E.2d 629 (N.C. Ct. App. 2006), *aff'd in part,*
  *modified in part and remanded,*
  *Walker v. Fleetwood Homes of N.C., Inc.,*
  653 S.E.2d 393 (N.C. 2007) .........................................47, 48, 51, 54

*Wilner v. Cedars of Chapel Hill, LLC,*
  773 S.E.2d 333 (2015)..................................................................42

*Wilson v. Blue Ridge Electric Membership Corp.,*
  578 S.E.2d 692 (N.C. Ct. App. 2003)..........................................48

*Winkler v. N. Carolina State Bd. of Plumbing,*
  843 S.E.2d 207 (N.C. 2020) .........................................................43

## STATUTES

28 U.S.C. § 1291 ...............................................................................3

28 U.S.C. § 1332 ...............................................................................3

N.C.G.S. § 39A-1 *et seq.* (2010)......................................... *passim*

N.C.G.S. § 39A-1(a) ...............................................................13, 56

N.C.G.S. § 39A-2(2) ....................................................... *passim*

N.C.G.S. § 39A-2(2)-(3)..................................................................13

N.C.G.S. § 39A-2(2)(b) .............................................................25, 33

N.C.G.S. § 39A-2(2)(c) ..............................................................33, 36

N.C.G.S. § 39A-2(2)(g) ............................................................... 33, 36

N.C.G.S. § 39A-2(2)(h) ............................................................. 14, 29, 30

N.C.G.S. § 39A-2(3) ........................................................................ 40

N.C.G.S. § 39A-3(b) ......................................................... 13, 39, 41, 42

N.C.G.S. § 47B-1(1) ................................................................... 13, 56

N.C.G.S. § 47C-3-102 ................................................................. 45, 59

N.C.G.S. § 47C-3-102(12a) ........................................................ 45, 47

N.C.G.S. §§ 47C-3-116(a)-(c) ............................................................. 4

N.C.G.S. § 47F-3-102 ................................................................. 45, 59

N.C.G.S. § 47F-3-102(13a) ............................................................... 47

N.C.G.S. §§ 47F-3-116(a)-(c) .............................................................. 4

N.C.G.S § 75-1.1 ................................................................... *passim*

N.C.G.S. § 75-50 *et seq* ........................................................... 12, 64

Ohio Rev. Code Ann. § 5301.057(A)(3) (2010) ......................................... 40

## **RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................. 9, 13, 29

N.C. R. App. P. 30(e)(3) ...................................................................... 35

## <u>OTHER AUTHORITIES</u>

Christopher D. McEachran,
*Recent Development: Sometimes Jumping on the Bandwagon is a Good Thing: An Analysis of North Carolina's Prohibition of Transfer Fee Covenants*, 89 N.C. L. Rev. 2201 (2011)............................................ 44, 56

*Black's Law Dictionary* (11th ed. 2019) .......................................... *passim*

Robert G. Byrd, *Misrepresentation in North Carolina*,
70 N.C. L. Rev. 323 (1992) ..................................................................... 50

RUBYHOME, https://www.rubyhome.com/blog/hHOA-stats/
(citing https://foundation.caionline.org/)
(last visited Dec. 22, 2022) ....................................................................... 1

## **INTRODUCTION**

Many North Carolina homeowners own property governed by a homeowners' association ("HOA"), an entity that is typically responsible for property upkeep, maintenance, financial planning, and other tasks.[1]

When it comes time to sell those properties, lenders and closing attorneys generally require the selling homeowner to pass along a document known as a statement of unpaid assessments (a "Statement"), which proves that there are no outstanding unpaid fees due to the HOA. That's important because, among other things, unpaid assessments are usually liens on the property. Thus, if the owner of an HOA-governed property wants to sell that property, they need the Statement to complete the transaction.

North Carolina law, however, protects the home buying and selling process by limiting restraints on the sale of homes, as well as by limiting the fees that can be charged at the time of those sales. In short, only *reasonable* fees of the kind at issue here, levied under fair circumstances, are allowed.

---

[1] Almost 26% of North Carolina homeowners own properties governed by HOAs. RUBYHOME, https://www.rubyhome.com/blog/hHOA-stats/ (citing https://foundation.caionline.org/) (last visited December 22, 2022).

Here, Plaintiff-Appellant Susan Carpenter had to pay *unreasonable* fees before she could complete the sale of two properties in Charlotte. That fee was demanded by two parties, Defendants William Douglas Management, Inc. ("William Douglas") and NextLevel Association Solutions, Inc. d/b/a HomeWiseDocs.com ("HomeWise"). Defendants jointly charged Carpenter (and the other homeowners in the putative class that she seeks to represent) hundreds of dollars for the simple confirmation on the Statements of a zero balance, a procedure that takes only a few computer keystrokes and minutes to complete. Defendants did this because they could: they abused their dominant positions, knowing that Carpenter and others like her had little alternative but to pay what they demanded. Such abusive and unreasonable business practices are unfair and unlawful in North Carolina.

Carpenter alleged several claims in her Amended Complaint, all arising from the unreasonable payments demanded by Defendants. The primary two claims arise from North Carolina statutes: one alleges a violation of Chapter 39A's prohibition against unreasonable real estate "transfer fees," and the other alleges a violation of the Unfair and

Deceptive Trade Practices Act (the "UDTPA"). The other claims are for unjust enrichment, negligent misrepresentation, civil conspiracy, and violation of the North Carolina Debt Collection Act.

The district court below dismissed all of the claims, but in doing so it ignored key allegations in the Amended Complaint and misinterpreted both Chapter 39A and the UDTPA. This Court should reverse and allow Carpenter to proceed with her claims.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction over this appeal of the district court's order dismissing the case under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred by dismissing Carpenter's complaint for failure to state a claim on which relief can be granted.

## STATEMENT OF THE CASE

**I.     In North Carolina, A Homeowner Cannot Sell a House Governed by an HOA Without a Statement of Unpaid Assessments.**

As a practical matter, a North Carolina homeowner whose home is governed by an HOA cannot sell the home without a Statement. (JA15). Such a Statement certifies that the selling homeowner does not owe any HOA assessments. (JA7-8). Notably, failure to pay HOA assessments can result in a lien on the property and foreclosure. *See* N.C.G.S. §§ 47C-3-116(a)-(c); N.C.G.S. §§ 47F-3-116(a)-(c). Without the Statement showing a zero balance, a closing attorney will not certify that the seller's title is free and clear of any liens or other encumbrances, and the closing cannot occur. (JA15). A Statement showing a zero balance is also often a condition of a lender in order to disburse loan funds to the buyer in question. (JA15). In short, the lender, closing attorney, and buyer require the reassurance that the property's title is unencumbered, and the Statement is the only practical mechanism to show this.

## II. William Douglas Performs Services for HOAs, Including Providing Statements of Unpaid Assessments.

HOAs routinely contract with property management companies, like William Douglas, to perform various services for the HOAs. (JA11). Here, Carpenter's HOA contracted with William Douglas to perform such services, including the services of managing the assessment and assessment collection process and generating the Statements. (JA10-11).

William Douglas uses software to track the imposition and collection of HOA assessments. (JA11). As part of its ordinary course of business, William Douglas generates reports that reflect the status of unpaid assessments for each homeowner. (JA12). The unpaid assessment statements will either list an amount owed or reflect a zero balance. (JA12). Because of this regular tracking, William Douglas can provide homeowners with the status of their HOA assessments upon demand. The process of generating Statements is simple and inexpensive, requiring a handful of keystrokes and approximately five minutes or less of an employee's time. (JA12-13).

### III. Defendants Jointly Provide Statements of Unpaid Assessments.

Although William Douglas can provide a Statement on its own, it entered into a service agreement with HomeWise to use HomeWise's internet-accessible software in order to provide Statements. (JA13). Thus, any request for a Statement must first go through HomeWise. (JA13). Homeowners cannot get a Statement without going through the HomeWise system. (JA13-14).

When a request for a Statement is made through HomeWise, a William Douglas employee receives the request, confirms that the homeowner does not have any unpaid assessments, and then documents that in the HomeWise system. (JA13-14). Defendants then send out a form document (a "Closing Letter"), which constitutes the required Statement. (JA13-14).

HomeWise and William Douglas together invoice homeowners directly for this service, with separate line items for each company, but each line describes the charge as "Closing Letter and Documents Package (Includes Transfer Fee)." (JA14, JA54-61, JA65-73). The fees charged under these procedures (the "Resale Fees") are payable at closing and not upon the provision of the Statement itself. (JA14). Indeed, the invoice

provides that the homeowner should, when paying the invoice by check, also provide a copy of the closing disclosure form and deed, both of which only become available at the actual closing. (JA58).

Statements of unpaid assessments are profit-generators for Defendants. (JA16). While providing these statements is simple and inexpensive for Defendants, Defendants jointly charge homeowners $175 or more between the two of them. (JA15).

For the homeowner, however, the Statement is necessary to close the sale, and the homeowner has no practical option to obtain one outside of Defendants. Neither Defendant contracts with homeowners directly (JA11-14), and homeowners cannot negotiate with Defendants regarding the fees charged for providing the statements of unpaid assessments (JA16, JA23).

## IV.   Defendants' Resale Fees are Unreasonable.

In order to sell her properties, Carpenter had to pay these Resale Fees—twice.

On April 2, 2020, Carpenter sold a home in Charlotte. (JA9). In order to sell the home, Carpenter was charged $150 by William Douglas and $25 by HomeWise for the "Closing Letter and Documents Package

(Includes Transfer Fee)." (JA14, JA26). The next day, Carpenter sold another home in Charlotte. (JA9). In order to sell that home, Carpenter was charged $215 by William Douglas and $40 by HomeWise for the same document. (JA9). This means that Carpenter was charged over $400 for two Statements that took mere minutes to produce.

The majority of the fee charged by Defendants is pure profit for them, only benefits Defendants (not the HOAs themselves), and exceeds the reasonable expectations of Carpenter and the putative class members about how much they might have to pay. (JA16). Carpenter and the putative class members have no power to negotiate the amount of the fee charged. (JA16). And Carpenter and the putative class members are not able to close on the sale of their homes unless they pay the Resale Fees. (JA16).

When establishing the rate to charge Carpenter, Defendants performed no analysis regarding the actual cost to provide the statement of unpaid assessments. (JA16). Moreover, while the transfer fees are ostensibly to provide the Statement to the seller, a portion of the fee is actually attributable to services provided to the buyer. (JA16). Specifically, as part of the Resale Fees charged to the seller, Defendants

provide a number of post-sale services and activities exclusively for the buyer that provide no benefit to the seller; these services include updating new owner information, generating welcome kits, and mailing information to the buyer. (JA16-17). Defendants do not disclose to the seller that they are charging the seller for these services rendered to the buyer. (JA17).

Based on these facts, Carpenter alleged that the Resale Fees were unreasonable because they were unlawfully high for the services provided, bore no relationship to the actual cost of performing the services, exceeded the reasonable expectation of Carpenter and the putative class members, represented pure profit to Defendants, and were arbitrary in amount. (JA22).

## V.    The District Court Dismissed Carpenter's Complaint.

Carpenter filed the Amended Complaint in this case on September 24, 2020. (JA7-45). Defendants moved to dismiss under Rule 12(b)(6) on January 26 and 27, 2022. (JA74-76, JA77-78). On September 29, 2022, the district court dismissed the Amended Complaint in its entirety. (JA79-91). Carpenter now appeals.

## SUMMARY OF ARGUMENT

1.    Carpenter stated a claim for Defendants' violation of the North Carolina Transfer Fee Covenants Prohibition act, N.C.G.S. § 39A-1 *et seq.* (2010) ("Chapter 39A").

First, Chapter 39A generally prohibits "transfer fees" associated with the sale of real property, and the statute specifically defines "transfer fee." The Resale Fees fall within that definition of "transfer fees" as a matter of statutory interpretation: the Resale Fees are "payable upon the transfer of an interest in real property," satisfying the first part of the definition, and they are also "paid for the right to make a transfer of real property," satisfying the second and disjunctive part of the definition. Although the Resale Fees need to satisfy just one prong of that definition, here they satisfy both prongs.

Second, and contrary to Defendants' argument below, the text of Chapter 39A shows that the statute generally prohibits "transfer fees," not just "transfer fee covenants." Therefore, Carpenter's allegation that the Resale Fees are unlawful and unreasonable "transfer fees" states a claim under Chapter 39A.

10

Third, the Resale Fees do not fall under the limited exception contained in Chapter 39A for certain "reasonable" transfer fees. Carpenter alleges that the fees here are *unreasonable* in a variety of ways.

2.    Carpenter stated a claim for Defendants' violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S § 75-1.1 ("UDTPA").

The UDTPA gives a consumer a private right of action against a defendant who engages in unfair or deceptive acts or practices that involve commerce and harm the consumer. North Carolina law widely defines what kind of practices are "unfair." Here, Carpenter alleges that Defendants' practices around the Resale Fees were unfair in several ways. First, the Resale Fees give rise to an UDTPA claim because Carpenter had no choice about how much to pay or whom to pay, as a result of Defendants' unfair abuse of their dominant position. Second, the Resale Fees give rise to an UDTPA claim because they violate longstanding North Carolina public policy, as well as a statute codifying that policy, Chapter 39A. Third, the Resale Fees give rise to an UDTPA claim because they are unfairly excessive and unrelated to the amount of

work required to produce the Statements. Finally, Carpenter alleged sufficient facts to show that she was harmed by the Resale Fees.

3.    Carpenter stated a claim for unjust enrichment. Contrary to the district court's summary assertion, that is an independent cause of action. And Carpenter has alleged at length the various ways that it would be unjust for Defendants to retain the fees here.

4.    Based on the facts alleged, Carpenter stated claims for Defendants' violation of the North Carolina Debt Collection Act ("NCDCA"), for negligent misrepresentation, and for civil conspiracy.

## **ARGUMENT**

## **Standard of Review**

When ruling on a motion to dismiss, "the Court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkarim*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must allege enough facts to state a claim for relief that is factually plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and "recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This Court reviews de novo a district court's dismissal under Rule 12(b)(6). *E.g., Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021).

## Discussion

## I.   CARPENTER STATED A CLAIM FOR VIOLATION OF NORTH CAROLINA'S TRANSFER FEE PROHIBITION ACT.

North Carolina's Chapter 39A generally prohibits fees associated with the transfer of real property. N.C.G.S § 39A-1 *et seq*. This is the codification of a longstanding public policy that all land in North Carolina should be "made freely alienable and marketable." N.C.G.S. § 47B-1(1); *see also* N.C.G.S. § 39A-1(a).

In service of this public policy, Chapter 39A prohibits three types of activities: (1) "record[ing] a transfer fee covenant;" (2) "fil[ing] a lien that purports to secure payment of a transfer fee;" and (3) "enter[ing] into an agreement imposing a private transfer fee obligation." N.C.G.S. § 39A-3(b). Because liability under Chapter 39A requires a "transfer fee covenant" or a "transfer fee," the statute defines both terms. *Id.* at § 39A-2(2)-(3). These definitions are detailed in Parts A and B below.

There are certain enumerated exceptions to these prohibitions against transfer fees and transfer fee covenants, one of which is directly relevant to this case: section 39A-2(2)(h) allows "[a]ny *reasonable* fee charged for the preparation of statements of unpaid assessments." *Id.* (emphasis added). (As explained below, the existence of that exception itself shows that statements of unpaid assessments are "transfer fees" and that only reasonable ones are allowed.)

Here, Carpenter alleges that Defendants' Resale Fees were transfer fees under Chapter 39A and were *not* reasonable, and therefore that Defendants violated Chapter 39A. The primary question as to the sufficiency of Carpenter's pleading, and the basis for dismissal below, is whether the fees Carpenter paid to Defendants concurrent with her property sales are "transfer fees" in the first place.

There are two primary reasons why the Resale Fees are "transfer fees" as a matter of law. First, the fees collected by the Defendants at the time of the sale of Carpenter's properties were "transfer fees" under the plain meaning of the statute. Second, Chapter 39A applies to both "transfer fees" and "transfer fee covenants," contrary to Defendants'

14

argument otherwise. Carpenter also alleged sufficient facts that the Resale Fees were unreasonable.

### A. The fees collected by Defendants are "transfer fees" under the plain meaning of Chapter 39A.

The fees collected by Defendants upon the transfer of Carpenter's properties to her buyers are real property "transfer fees" under the plain meaning of Chapter 39A.

Under North Carolina law, when the meaning of a statutory term is at issue, analysis must begin with the plain meaning of the text of the statute. *See Broad St. Clinic Found v. Weeks*, 848 S.E.2d 224, 229 (N.C. Ct. App. 2020) (beginning statutory interpretation with the plain text of the statute); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (explaining that statutory interpretation begins with the text of the statute itself and looks for plain meaning).

Importantly, "where the statute has provided a definition, we must use that definition." *Roybal v. Raulli*, 832 S.E.2d 202, 212 (N.C. Ct. App. 2019). When terms are undefined, North Carolina law directs that "words in the statute must be taken in their plain and ordinary meaning" unless there is something in the statute requiring otherwise. *Patel v. Stone*, 531 S.E.2d 879, 880 (N.C. Ct. App. 2000).

15

In this case, Chapter 39A defines the disputed term. A "transfer fee" is defined as:

> A fee or charge payable upon the transfer of an interest in real property or payable for the right to make or accept such transfer, regardless of whether the fee or charge is a fixed amount or is determined as a percentage or the value of the property, the purchase price, or other consideration given for transfer.

N.C.G.S. § 39A-2(2). Thus, the statute offers two separate definitions of "transfer fee:" (1) a fee "payable upon the transfer of an interest in real property;" or (2) a fee "payable for the right to make or accept such transfer." *Id.*

Principles of statutory interpretation reveal that Resale Fees are transfer fees under both of these definitions. Moreover, Defendants themselves admitted that the Resale Fees were transfer fees. Other parts of the statute provide additional support for the conclusion that the Resale Fees are transfer fees.

16

## 1. Defendants' fees are "payable upon the transfer of interest in real property."

The first definition of "transfer fee" under Chapter 39A is "[a] fee or charge payable upon the transfer of an interest in real property." N.C.G.S. § 39A-2(2). Here, the Resale Fees are "payable upon the transfer of an interest in real property." Several points mandate this conclusion.

### i. The Amended Complaint alleges sufficient facts that the Resale Fees were payable upon closing, which is upon a transfer of interest in real property.

The Amended Complaint alleges sufficient facts supporting this interpretation, and it also attached two exhibits providing further support. (JA14, JA23). First, HomeWise's own invoice, Exhibit B to the Amended Complaint, instructed Carpenter that the invoice was payable at closing, telling her to "please return this form with your check and certified copies of the closing disclosure form . . . and the grant or warranty deed [both of which become available only at the closing]." (JA15, JA58).

Second, the closing disclosure form, Exhibit C to the Amended Complaint, directed that the fees would come out of Carpenter's proceeds at closing. (JA63-64).

17

Thus, Defendants not only expected that Carpenter would pay the fees at closing, but it was also known that the money to pay them would not even be available until the closing was completed. These facts must be viewed in Carpenter's favor. *See Mylan Labs.*, 7 F.3d at 1134. Therefore, the Resale Fees were payable at closing, and a real estate closing is indisputably a "transfer of an interest in real property."

> ii.    **The district court's interpretation is based on flawed reasoning.**

The district court's decision rested on whether the Resale Fees were "payable" under both prongs of the statutory definition, both of which use that word. (JA85-88). In concluding that they were not, the district court reasoned that "the fee charged to [Carpenter] was payable on the *preparation of the statement of unpaid assessments*, not 'payable upon the transfer of an interest in real property or payable for the right to make or accept such transfer.'" (JA86) (emphasis added) (citing the definition). Put differently, the district court viewed the trigger for the fees being "payable" as the preparation of the statements, rather than the closing of the sale of the real property.

There are a few problems with this reasoning. As an initial matter, it fails to give appropriate deference to Carpenter's allegations of the

facts, as explained above. The district court stated that "the documents attached to [Carpenter's] Complaint demonstrate that the fees became a sum of money to be paid, or 'payable,' when the statements were prepared, before the properties were transferred." (JA85). That interpretation of the facts alleged is inaccurate, conflicting with both Carpenter's allegation that the fees were "charge[d]…at the time of closing" (JA14) and the HomeWise invoice and closing disclosure form, which show that the invoice was not to be paid until the closing. At best for Defendants, whether the fees were "payable" in advance of the closing or at closing is an issue of fact to be determined in discovery, rendering dismissal on those grounds inappropriate. *See Mylan Labs.*, 7 F.3d at 1134.

The district court's interpretation of the definition also falls apart when closely examined.[2] Presenting a nesting doll's worth of definitions within definitions, the opinion cites Black's Law Dictionary for "payable" and "due." (JA85). Neither of these terms are in dispute, nor are they

---

[2] The district court's opinion follows and cites *Fleming v. Cedar Management Group*, 866 S.E.2d 919 (table), 2022 WL 29786, at *3 (N.C. Ct. App. Jan. 4, 2022). As explained below in Part I(A)(5), that opinion is not binding, poorly reasoned, and involved different allegations.

legal terms of art. Indeed, the word "due" is not even in the statute. As explained above, "where the statute has provided a definition, [this Court] must use that definition." *Roybal*, 832 S.E.2d at 212. Therefore, nothing calls for using Black's nor any other dictionary here, because the *disputed term is already defined* and the text of that definition establishes that the Resale Fees are "transfer fees."

Even if this Court follows the district court's strategy of choosing to define terms within the definition, the district court's analysis is inconsistent with the ordinary meaning of the terms. When terms are undefined, the "words in the statute must be taken in their plain and ordinary meaning." *Patel*, 531 S.E.2d at 880. Black's Law Dictionary defines "payable" as a sum of money that "is to be paid," and it explains that "an amount may be payable without being due." *Black's Law Dictionary* (11th ed. 2019). The district court then cites Black's definition of "due" as "immediately enforceable." *Id*.; (JA85). The court's reasoning, via these definitions, is that the time that the payment was actually made is irrelevant, because the fees matured into "to be paid" status (became "payable") at the very creation of the statement of unpaid assessment. (*See* JA85-86).

20

That is far from the ordinary meaning of the definition supplied by North Carolina's legislature. This prong of the definition of "transfer fee" is a simple one: "[a] fee or charge payable upon the transfer of an interest in real property." N.C.G.S. § 39A-2(2). Even if "payable" means only "to be paid," as Black's Law Dictionary and the district court assert, then the fact that the Resale Fees here were actually paid out of the proceeds of the sale at the time of settlement is entirely consistent with the most ordinary meaning of "to be paid:" that the Resale Fees were "to be paid" at closing, when "the transfer of an interest in real property" took place. In other words, the average person would think that if a fee is actually paid at closing, it is "payable" at closing.

Moreover, if this Court wants to continue with the dictionary instead of stopping with the statutory definition, the part of the Black's definition that "an amount *may* be payable without being due" is consistent with Carpenter's argument here. *Black's Law Dictionary* (11th ed. 2019) (emphasis added). The district court cites this qualification and the definition of "due," as being "immediately enforceable," implicitly concluding that "payable" cannot have the same meaning as "due." (JA85-86). The district court seems to think that if a payment is due at a certain

21

time, then it *must* have become payable before that. That is the justification for the conclusion that the Resale Fees are "payable" upon the mere creation of the reports.

That analysis, however, tortures the statutory definition. The word "due" does not appear in the statute at all. But more to the point here, although under the Black's definitions something *may* become "payable" before it is due, the other implication of the Black's definitions is that something *may* become "payable" at the same time that it is due. "May" does not mean "must." In other words, the Black's definitions used by the district court broadly define "payable" from a temporal perspective—and contrary to the district court's conclusion, nothing in those dictionary definitions conclusively means that the fees here were only payable before closing, upon the creation of the Statements.

Thus, if Black's Dictionary is correctly applied, the Resale Fees should be viewed as potentially "payable" *both* at the creation of the report as well as at the time of closing. To take this further, based on Black's, the Resale Fees would also be payable during the time in between as well, after the creation of the report and before closing. But what matters is that Carpenter alleged the Resale Fees were payable at

22

closing; even if they could be paid earlier, and even if they were "payable" earlier, they still were "payable" and paid at closing. Because the Complaint must be viewed favorably to Carpenter and because it alleges that the Resale Fees were payable at closing, the Chapter 39A claim should not have been dismissed.

### iii. Defendants' conception of "transfer of real property" is too narrow.

Finally, Defendants suggested below that because the Resale Fees theoretically *could* be paid before closing, they are not payable "upon the transfer of real property" under Chapter 39A's definition. But conjuring alternative times as to when the fees could have been paid contradicts an ordinary understanding of what "a transfer of real property" means. Both the word "payable" and the term "transfer of real property" should be understood broadly.

In the context here, a "transfer of real property" is the sale of a home. A narrower conception of the transfer of real property acts as if the sale of a home is something that can be done instantly, perhaps with the wave of a magic wand, and it does not reflect the ordinary meaning of that phrase.

To the contrary, a myriad of steps and a variety of professionals are usually involved in the transfer of real property in advance of the closing date itself. In cases like this one, there is the added step where the seller must secure a Statement, or the closing cannot happen. Even in sales of property where an HOA is not involved, a transfer of real property cannot occur without significant preparation outside of the signing on closing day. This process involves the help of many professionals who are often only paid at the conclusion of the sale.

One example of this are the services provided by realtors during the home buying process. If a home seller engages a realtor, it is usually at the very beginning of the home sale process. The realtor will help the seller price the home, photograph the home, list it on the Multiple Listing Service ("MLS") so that shoppers can view the home online, arrange showings, and perhaps even stage the home. All of these services are rendered before any sale can be finalized. Typically, the realtor does not receive any payment until the closing, when they are paid with a percentage of proceeds from the home sale.

Chapter 39A acknowledges the role of realtors and makes an exception for realtor commissions from the broad prohibitions against

transfer fees. That is, 39A-2(2)(b) excludes "[a]ny commission payable to a licensed real estate broker for the transfer of real property" from the prohibition on transfer fees. Under the district court's analysis, such fees could not be "transfer fees" in the first place because they are based on services rendered before the closing date itself and supposedly "payable" before closing. The General Assembly would not go out of its way to exclude fees like realtor commissions, which are based on services rendered prior to closing but not paid until closing, if they were already outside of the scope of transfer fees. In other words, if an exception for realtor fees is needed, then realtor fees must otherwise be transfer fees under Chapter 39A—even though, just like the fees here, they are charged and incurred before closing but paid at closing.

Moreover, the idea of fees being payable at closing does not mean that if they are paid a day or two early, they are no longer paid upon closing. As explained above, the process of closing a house is a long one, and it is immaterial whether the fee is paid a week before the actual closing documents are signed. In both cases, the fees are paid pursuant to the transfer of real property.

25

In short, the facts alleged in the Amended Complaint, combined with the plain meaning of the statutory terms at issue, all show that the Resale Fees are "transfer fees" within the first statutory definition.

### 2. Defendants' fees are paid "for the right to make [a] transfer" of real property.

Not only are the Resale Fees "transfer fees" under the first prong of the definition, but they also qualify under the second prong, which provides that a "transfer fee" is a fee that is "payable for the right to make or accept such transfer" of real property. N.C.G.S. § 39A-2(2). Because Carpenter was required to pay Defendants' fees in order to transfer her properties, this definition applies.[3]

The Amended Complaint outlines the mechanics by which a homeowner dealing with an HOA is held hostage to the need for a Statement. (JA15). There are two major ways that the homeowner is bound by the Statement process. First, without such a statement, the "closing attorney will not certify to a title insurance company that the title is free and clear of any HOA liens for assessments." (JA15). Second,

---

[3] As explained above, the district court held that this definition did not apply because the Resale Fees were not "payable" under this definition, for the same reasons that the Resale Fees were supposedly not payable under the first definition.

a lender for the buyer will not usually disburse loan funds without one. (JA15). Here, Carpenter could not complete the sale of her properties without the statement of clear title, nor would her buyer have the money to pay for the property without the disbursement of funds from the lender. Certainly, without money to pay for the property, there is no transfer of that property.

Defendants' contrary argument in the court below is not persuasive at all. Essentially, Defendants suggest that unpaid assessment statements are merely incidental to the home sale process, because a potential buyer could simply pay all cash for the property; such a buyer would not need to meet lender requirements for an unpaid assessment statement and therefore could choose not to insist on one from the seller. And regarding the title issue, Defendants suggest that the seller (or buyer) could hire a private attorney to do a title search on the property to ensure that it is free of liens (including assessments).

Both of these suggestions ignore the actual situation of the vast majority of home sellers and buyers, who are neither able to pay cash for a home nor have a real estate attorney on retainer. And most buyers wouldn't accept a possible lien or unclear title even if they paid cash and

could choose to accept that. Moreover, a seller is often not in a position to wait for an all-cash buyer who does not need financing. Sellers are over a barrel in this scenario: they will pay for the Statements because it is what they have to do to sell their property. In short, Defendants entirely ignore how the world actually works, and their argument is simply "let them eat cake."

Because Carpenter could not practically sell her home without the Statement and could not get the Statement without paying the Resale Fees, those fees are "transfer fees" under the second prong of the definition in Chapter 39A.

> ### 3. Defendants admitted that their fees are "transfer fees" under Chapter 39A.

Carpenter is not the only one to understand that the Resale Fees are "transfer fees." Defendants themselves described the fees levied as part of Carpenter's sales as "transfer fees."

Before this litigation began, Defendants referred to the Statement as a "Closing Letter and Documents Package (includes Transfer Fee)." (JA58). HomeWise changed its position after litigation began, but William Douglas admitted to charging transfer fees under Chapter 39A in its response to a request for admission about that. (JA50-51). There,

William Douglas admitted that its portion of the joint fee was a "transfer fee" under Chapter 39A but relied on the defense that it was a reasonable one, as allowed by N.C.G.S. § 39A-2(2)(h). (The issue of reasonableness, however, is a factual issue not suitable for Rule 12(b)(6), as explained below). What's telling here is that even a defendant represented by counsel believed, after being asked specifically about the issue, that the fees here were "transfer fees" as defined in Chapter 39A. That is compelling evidence for how a reasonable person might read Chapter 39A.

> **4.  The district court's interpretation completely ignores the exception for "reasonable" statement fees, rendering it surplusage.**

A fundamental principle of North Carolina law is that "a statute must be considered as a whole and construed, if possible, so that none of its provisions shall be rendered useless or redundant." *Porsh Builders, Inc. v. City of Winston-Salem*, 276 S.E.2d 443, 446–47 (N.C. 1981). This presumption against "mere surplusage" requires reading a statute to give meaningful effect to every term. *See Domestic Elec. Serv., Inc. v. City of Rocky Mount*, 203 S.E.2d 838, 843 (N.C. 1974) ("The presumption is that no part of a statute is mere surplusage, but each provision adds

something which would not otherwise be included in its terms.") Further, the United States Supreme Court has held that "[t]he preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Thus, it is important to view the definition of "transfer fees," discussed above, within the overall context of Chapter 39A.

The statute's overall purpose is to prohibit transfer fees and transfer fee covenants. *See* N.C.G.S. § 39A-1 (detailing the ways that transfer fees and transfer fee covenants are contrary to the public policy of North Carolina). Certain exceptions are carved out, however, such as the one relevant here. That exception allows "[a]ny reasonable fee charged for the preparation of statements of unpaid assessments…." *Id.* at § 39A-2(2)(h).

There are two key takeaways from the text of that exception. First, it mentions statements of unpaid assessments by name, which is compelling evidence that the General Assembly viewed such fees for statements as transfer fees. Second, the exception will be mere surplusage if this Court follows Defendants' favored interpretation.

30

To the first point, the most important principles of statutory interpretation require this Court to recognize the significance of the specific mention of statements of unpaid assessments in Chapter 39A. *See BedRoc Ltd*, 541 U.S. at 183 (articulating the "preeminent canon" of statutory interpretation that it should be assumed that legislatures draft statutes intentionally). It is not an accident that Chapter 39A directly considers Statements in its very text. This is not subtle, it is literal: reasonable fees for the preparation of unpaid assessments are spelled out as an exception to the overall scheme.

Rarely are statutes so generous to courts seeking to interpret them as Chapter 39A is in this case. Not only does it define the disputed term, but it then directly addresses the exact point at issue in a subsequent provision. This leads to the next takeaway that the exception demands.

Problematically for Defendants, if fees for the preparation of statements of unpaid assessments are *not* transfer fees under the statute, the exception has no effect whatsoever. Their interpretation then directly contravenes North Carolina's rule that every part of a statute should have meaningful effect. *See Domestic Elec. Serv.,* 203 S.E.2d at 843. (explaining that "each provision adds something which would not

otherwise be included in its terms.") There would be no need for an exception for something that is not covered under the statute in the first place.

Thus, the only logical interpretation of the exception is that fees for the preparation of Statements are transfer fees covered by the statute, but any such "reasonable" fees are carved out and allowed—whereas any such unreasonable fees are not allowed. Put another way: if all fees like the Resale Fees were not "transfer fees" in the first place, then why include an exception for ones that are reasonable? The exception makes the legislature's intent clear, and that intent is the entire polestar of statutory interpretation. And to whatever extent that parsing the dictionary definitions does not lead to a clear and definitive answer, this exception cuts the Gordian Knot and makes the task of interpreting the statute easy—because it makes crystal clear that the legislature intended to allow only reasonable statement fees and not unreasonable statement fees.

Other pieces of the statute read as a whole also compel this conclusion. Notably, section 39A-2(2) excludes other types of fees from the definition of "transfer fee" without any requirement that such fees be

"reasonable." *See, e.g.*, N.C.G.S. §§ 39A-2(2)(b) (excluding broker commissions); (c) (excluding amounts payable to a lender); (g) (excluding "[a]ny fee charged that is a typical real estate closing cost, including closing or escrow fees, settlement fees, attorney fees, or title insurance premiums and fees."). If the General Assembly acted intentionally by excluding all fees for broker commissions, it also acted intentionally by limiting the exclusion for Statement-related fees to only "reasonable" ones. *See BedRoc Ltd*, 541 U.S. at 183 (articulating the "preeminent canon" of statutory interpretation that it should be assumed that legislatures draft statutes intentionally). In other words, by excepting only "reasonable" statement fees, the legislature clearly wanted to prohibit unreasonable statement fees.

The district court responded to this argument in only one sentence, asserting that it "puts 'the cart before the horse' by raising exceptions before demonstrating the fees were 'transfer fees' at all under the plain language of the statute." (JA87 (quoting *Fleming*, 866 S.E.2d at 919)). Respectfully, that makes no sense. The question at hand is whether the statement fees are "transfer fees." One piece of evidence that they are is the fact that the statute has an exception for "unreasonable" statement

33

fees. Thus, if statement fees are not "transfer fees," then that exception becomes surplusage—which should be avoided, because all terms are to be construed together, given effect to each. That conclusion is unavoidable. The district court (and *Fleming*) may not like it, but it's true. And the district court cannot get around that by illogically claiming that Carpenter is improperly trying to employ an exception *before* defining the term from which the exception is taken, when what Carpenter is really doing is construing the term and its exception *at the same time* in order to give effect to each. Indeed, the exception by definition is an exception *from something*, and thus the exception inherently helps define the thing from which it is carved out.

### 5. *Fleming* is not binding, directly applicable to this case, or persuasive.

Although it is not binding, directly applicable to this case, or persuasive, there is a North Carolina state court case that should be addressed. *Fleming v. Cedar Management Group* is an unpublished case from the North Carolina Court of Appeals that has tangential relevance to this case. *See Fleming v. Cedar Management Group*, 866 S.E.2d 919 (table), 2022 WL 29786 at *3 (N.C. Ct. App. Jan. 4, 2022).

Unpublished opinions from the North Carolina Court of Appeals are, as a matter of explicit rule, not authoritative. N.C. R. App. P. 30(e)(3) ("An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority."). Not only that, but the defendants in *Fleming* moved to publish the opinion, but the motion was denied, meaning that the Court of Appeals intentionally limited *Fleming*'s result to that case. Finally, even published intermediate state appellate court decisions are not binding on this Court. *See, e.g.*, *Sanderson v. Rice*, 777 F.2d 902, 905 (4th Cir. 1985).

Even setting aside the fact that *Fleming* is without precedential value, there are several good reasons that it should not control here and is not persuasive. In *Fleming*, North Carolina's Court of Appeals decided that the plaintiffs alleged that a fee for a statement of unpaid assessments was payable upon the *preparation* of a statement of unpaid assessments and not upon the transfer of real property. 2022 WL 29786

35

at *3. Thus, the fees in that case were not "transfer fees" under the statute, similar to what the district court concluded below.[4]

One reason that *Fleming* should not control is that the present case is distinct on its pleadings. Carpenter alleges that the Resale Fees are payable upon transfer, not upon preparation of the statement itself. Carpenter even attached an invoice from HomeWise showing how this worked. The invoice stated: "please return this form with your check and certified copies of the closing disclosure form (formerly the HUD-1 form) and the grant or warranty deed." (JA58). The closing disclosures attached to the Amended Complaint provided further support to this point. These types of documents were not attached to the Complaint in *Fleming*, and *Fleming* did not involve an explicit allegation that the fees were payable at closing, and so this case is not *Fleming* redux.

---

[4] *Fleming* also suggests a concern that if an unreasonable fee for a statement of unpaid assessments is a transfer fee, it "would result in any payment at closing being a transfer fee if not if not specifically excepted…" 2022 WL 29786 at *3. But that is precisely what the plain language of Chapter 39A provides: the general definition of "transfer fee" is expansive, but the broad exceptions are meant to cover the common fees that are usually charged in a real estate closing. *See, e.g.*, N.C.G.S. § 39A-2(2)(c), (g).

*Fleming* also should not control because it is not persuasive, because it used almost no reasoning to reach its conclusion. There is no statutory interpretation analysis at all in the opinion. Rather, *Fleming* simply points to the notion that the fees were payable upon preparation of the statements and then summarily concludes that this means they were not payable upon the transfer of an interest in real property. *See Fleming*, 2022 WL 29786 at *3. This circular reasoning assumes its own conclusion and ends there. North Carolina law, however, demands that this Court do the work of interpreting the statute following canons of construction and other legal principles. Moreover, *Fleming* never truly engaged with the surplusage argument—to which there is no good response—instead illogically waiving it away, as the district court did below in this case.

Not only is *Fleming* poorly reasoned, but it has been recognized as such. In connection with a petition for panel rehearing, 19 experienced North Carolina attorneys from diverse practice areas certified to their belief that it was wrongly decided, including because the opinion rendered the explicit exception for "reasonable" statements as mere surplusage. (Dkt. No. 49-1 pp. 29-75). Although the Court of Appeals

37

declined to rehear the matter with explanation, the fact that it intentionally limited the case's effect and declined to publish the opinion is evidence that the court itself did not view *Fleming* as worthy of being applied in other cases. This Court should not give *Fleming* any more airtime than it already mistakenly had from the district court.[5]

> **B.    Chapter 39A applies to "transfer fees," not just "transfer fee covenants."**

The district court's analysis centered on whether the Resale Fees are transfer fees under Chapter 39A. Below, however, Defendants made another argument: that the statute does not even apply to transfer fees at all, only transfer fee covenants. To the contrary, it is clear that Chapter 39A applies to both transfer fees and transfer fee covenants.

---

[5] The Middle District of North Carolina recently committed the same error regarding the meaning of "transfer fees" under Chapter 39A, summarily holding—in one sentence without any citation or explanation whatsoever—that resale fees of this kind were not transfer fees. *See Dernoshek v. FirstService Residential, Inc.*, No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Sept. 23, 2022) (granting summary judgment for defendants on Chapter 39A claim) (partially vacated on other grounds upon reconsideration, *Dernoshek v. FirstService Residential, Inc.*, No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Dec. 8, 2022)). That was an incorrect interpretation of Chapter 39A based on no statutory analysis at all.

1.    **The plain text of Chapter 39A shows that it applies to transfer fees.**

The argument above shows that the Resale Fees are "transfer fees" under the statute. Any argument that the statute does not apply to transfer fees at all is inconsistent with the foregoing, and even the district court's analysis below assumes that transfer fees are covered by Chapter 39A. However, given that Defendants focused below on the contrary argument, Carpenter will explain why it's wrong.

To reiterate, Chapter 39A broadly prohibits the following three types of activities in relation to the sale of real property: (1) "record[ing] a *transfer fee covenant*"; (2) "fil[ing] a lien that purports to secure payment of a *transfer fee*"; and (3) "enter[ing] into an agreement imposing a private *transfer fee* obligation." N.C.G.S. § 39A-3(b) (emphasis added). The statute then defines both "transfer fee" and "transfer fee covenant."

First, just as this Court should recognize that Chapter 39A provides the exception for "reasonable fees charged for the preparation of statements of unpaid assessments" for a reason, this Court should recognize that Chapter 39A mentions "transfer fees" for a reason. The reference to "transfer fees" twice in the statute's outline of what is prohibited, and the statute's definition of "transfer fee," makes clear what

39

is prohibited: two things involving "transfer fees" and one thing involving "transfer fee covenants." Each of those three prohibitions is independent, and each must have meaning and be enforced.

There is other text in the statute buttressing this plain text interpretation. Specifically, "Transfer fee covenant" is defined as

> a declaration or covenant purporting to affect real property that requires or purports to require the payment of a transfer fee to the declarant or other person specified in the declaration or covenant or to their successors or assigns, upon a subsequent transfer of an interest in the real property.

N.C.G.S. § 39A-2(3). This definition reveals that all transfer fee covenants involve transfer fees, but *not* that all transfer fees necessarily involve transfer fee covenants. Indeed, the definition of "transfer fee" mentions nothing about covenants.

By way of comparison, the State of Ohio passed a similar statute the same year that North Carolina passed Chapter 39A. Under Ohio's statute, a "transfer fee" is defined as "a fee or charge *required by a transfer fee covenant....*" Ohio Rev. Code Ann. § 5301.057(A)(3) (2010) (emphasis added), thereby linking the two terms. In contrast, North Carolina's Chapter 39A defines "transfer fee" *without reference* to a transfer fee covenant, meaning that in North Carolina a transfer fee can

40

be charged (and therefore be unlawful) without being part of a transfer fee covenant.

The fact that Chapter 39A's title, "Transfer Fee Covenants Prohibited," does not specifically reference transfer fees does not change anything. Under North Carolina law, "[i]t is a well settled rule of statutory construction that the title of an act, although some evidence of legislative intent where the meaning of a statute is in doubt, cannot override, or otherwise limit, unambiguous language." *See Bethania Town Lot Comm. v. City of Winston-Salem*, 486 S.E.2d 729, 732–33 (N.C. Ct. App. 1997), *aff'd*, 502 S.E.2d 360 (N.C. 1998). Here, N.C.G.S. § 39A-3(b) unambiguously lists three prohibitions, one of which deals with recording transfer fee covenants and two of which directly deal with transfer fee obligations. The mere title of the chapter cannot and does not change that.

North Carolina law is short on cases interpreting Chapter 39A.[6] But there is a published decision interpreting Chapter 39A that answers the question of whether both transfer fees and transfer fee covenants are

---

[6] Perhaps this is one reason why the district court was eager to follow *Fleming*, despite its obvious problems.

covered. *See Wilner v. Cedars of Chapel Hill, LLC*, 773 S.E.2d 333, 337 (2015) ("Chapter 39A of the North Carolina General Statutes provides that a transfer fee violates North Carolina's public policy in favor of the alienability of real property."). In *Wilner*, a unanimous panel held that membership fees for benefits available apart from the transfer of real property—in that case fees for access to a health center—"might otherwise be considered transfer fees" prohibited by Chapter 39A if not for a separate statutory exception. 773 S.E.2d at 337–38. Thus, *Wilner* makes clear that Chapter 39A prohibits transfer fees, and not just transfer fee covenants.

Finally, Carpenter sufficiently alleges that Defendants entered into "an agreement imposing a private transfer fee obligation," which is prohibited under N.C.G.S. § 39A-3(b). Specifically, William Douglas entered into agreements with HOAs about the transfer fees and then, in turn, entered into a service agreement with HomeWise about those transfer fees. (JA11, JA13). Defendants then jointly invoiced Carpenter for the statements of unpaid assessments. (JA14). Accordingly, Defendants imposed a private transfer fee obligation on Carpenter.

### 2. The legislative history does not contradict the plain text, which is controlling anyhow.

In the court below, Defendants relied heavily on supposed "legislative history" to show that Chapter 39A does not prohibit transfer fees. As an initial matter, legislative history is consulted only when the language of a statute is ambiguous. *See Winkler v. N. Carolina State Bd. of Plumbing*, 843 S.E.2d 207, 210 (N.C. 2020) ("[w]hen the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required" (citation omitted)). Here the statute is unambiguous, so there is no need to go outside of it.

Furthermore, just calling something "legislative history" does not make it such. Legislative history is "[t]he proceedings leading to the enactment of a statute, including hearings, committee reports, and floor debates." *Black's Law Dictionary* (11th ed. 2019). Defendants' so-called legislative history—primarily a law student note—is not legislative history that can support their interpretation of Chapter 39A. Neither are Defendants' other sources, a newsletter and a personal letter.

Moreover, the topic of the student note is transfer fee *covenants*, not transfer fees more generally, and the paper makes no pretense to offering

43

a textual analysis of "transfer fees" under the statute. *See generally*
Christopher D. McEachran, *Recent Development: Sometimes Jumping on
the Bandwagon is a Good Thing: An Analysis of North Carolina's
Prohibition of Transfer Fee Covenants*, 89 N.C. L. REV. 2201 (2011). Thus,
nothing in the student note contradicts the idea that North Carolina took
a broad approach in prohibiting both transfer fee covenants as well as
transfer fees.

### C. Carpenter sufficiently pleaded that the Resale Fees here were not reasonable.

Chapter 39A allows only "reasonable" fees for Statements, and
Carpenter sufficiently pleaded here that the Resale Fees were
unreasonable. The district court below never addressed this issue
because it concluded that the Resale Fees were not covered by Chapter
39A at all.

Carpenter alleged that the amount charged was unreasonable, that
Defendants leveraged the importance of the statement of unpaid
assessments to maximize profits, that the fee bears no relationship to its
actual cost, and that the amount is arbitrarily determined. (JA15, JA20,
JA22). Carpenter also alleged that the nature of the fee itself was
misrepresented as being for the benefit of the seller, when it was really

44

for the benefit of the buyer. In short, Defendants charge hundreds of dollars for the production of Statements, when it takes a matter of minutes and a few keystrokes to produce one. This is sufficient to state a claim that the Resale Fees were "unreasonable."

In the court below, Defendants sought to retroactively apply a July 2020 amendment to N.C.G.S. §§ 47C-3-102 ("Chapter 47C") and 47F-3-102 ("Chapter 47F") to this case. The events in this case, however, all occurred before that amendment was enacted. And North Carolina statutes are presumed to have only prospective effect, unless the statute clearly provides otherwise. *See, e.g.*, *State v. Green*, 514 S.E.2d 724, 727 (N.C. 1999). This Court confronted this issue recently, noting that "if an amendment alters the substance of the statute, it is considered altering and not clarifying and courts should apply it prospectively only from the effective date of the statute." *Suarez v. Camden Prop. Tr.*, 818 F. App'x 204, 208 (4th Cir. 2020) (unpublished) (citing *Ray v. North Carolina Dept. of Transp.*, 727 S.E.2d 675, 681–2 (N.C. 2012)).

Prior to the 2020 amendment, Chapters 47C and 47F allowed HOAs to "impose reasonable charges" for statements of unpaid assessments. The 2020 amendment added two new subsections (12a and 13a,

45

respectively) that capped what was considered "reasonable" as "not to exceed two hundred dollars ($200.00) per statement or request, and an additional expedite fee in an amount not to exceed one hundred dollars ($100.00) if the request is made within 48 hours of closing…." The 2020 amendment was clearly a substantive change, creating a new cap on what is considered "reasonable" and also providing a new authority to charge an "expedite fee" not to exceed $100. And nothing in the amendment provided that it would apply retroactively. Consequently, the 2020 amendment operates only prospectively and does affect the validity of the Resale Fees in this case.

Moreover, even if the 2020 amendment did apply retroactively, it does not provide a license to charge the absolute maximum as a matter of course. Instead, the 2020 amendment provides that the amount must still be "*reasonable*," and then it sets a ceiling as to what can be considered reasonable. This is a maximum allowed amount, not a minimum or safe harbor or always-allowable amount. And here, Carpenter has sufficiently pleaded that the amounts were unreasonable in this case.

Similarly, even if the 2020 amendment did apply retroactively, Defendants clearly violated the "expedite" fee portion of that amendment. Prior to the 2020 amendment, there was no statutory authority for expedite fees at all. Even after the amendment, expedite fees are allowed only if the requests are made within 48 hours of closing. N.C.G.S. §§ 47C-3-102(12a), 47F-3-102(13a). Here, Defendants charged $40 and $10 in "Rush Fees" (JA57-58) for one property even though the request was made more than 48 hours before the anticipated closing and the actual closing (JA56-58, JA9).

## II.  CARPENTER STATED A CLAIM FOR VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT.

To prevail under the UDTPA, plaintiffs "must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *See, e.g., Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007). Unlike statutory analogues in many other states, the UDTPA does not contain a list of specific business practices that are prohibited. *See, e.g.*, *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988).

47

The history and case law surrounding the UDTPA show that it is meant as a gap-filler, to provide a remedy for unfairness and deception in commerce when the facts at issue do not fit neatly into a box for another cause of action like breach of fiduciary duty, breach of the covenant of good faith and fair dealing, violation of a specific statutory prohibition, etc. *See, e.g.*, *Marshall v. Miller*, 276 S.E.2d 397, 400 (N.C. 1981) (noting that the UDTPA was enacted because various existing remedies were ineffective given their particular elements, *e.g.*, intent to deceive for fraud, or defenses, *e.g.,* puffery for fraud and breach of contract; *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 627 S.E.2d 629, 633 (N.C. Ct. App. 2006), aff'd in part, modified in part and remanded, 653 S.E.2d 393 (N.C. 2007) (noting the UDTPA's "broad remedial purpose"). In other words, UDTPA claims are not "tag along" claims that rely on other claims, and it is increasingly common for plaintiffs to bring *only* UDTPA claims. *See, e.g.*, *Wilson v. Blue Ridge Electric Membership Corp.*, 578 S.E.2d 692, 693 (N.C. Ct. App. 2003) (stating that a UDTPA claim alone was raised in corporate governance dispute).

While there are several types of UDTPA claims, the claim here is that Defendants acted unfairly. In such a case, whether the disputed

practice was "unfair" is usually the critical question for a court, and that's true in this case: the primary issue is whether Carpenter has sufficiently alleged "unfairness" for purposes of a motion to dismiss. She has. Regarding the second element, it is undisputed that the Resale Fees were "in or affecting commerce." Regarding the third element, Defendants weakly argued below that Carpenter was not injured by paying the Resale Feels, but that is wrong.

### A. Defendants' actions are "unfair" under the UDTPA.

Unfairness in the UDTPA context is a nebulous concept, taking many forms. *See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 902 (4th Cir. 1996). ("What constitutes an unfair or deceptive trade practice is a somewhat nebulous concept.") Thus, the determination of unfairness is intensely case-specific: "the fair or unfair nature of a particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 248 S.E.2d 739, 744 (N.C. Ct. App. 1978), *review denied*, 251 S.E.2d 469 (1979). That is not a mechanical determination or an abstract one; rather, the unfairness of particular conduct is a gut-level determination that a court

must make based on the particular allegations in a case. *See Gilbane*, 80 F.3d at 902 ("[T]he fairness or unfairness of particular conduct is not an abstraction to be derived by logic.") However, North Carolina courts apply the UDTPA "liberally." *See id.* at 903 ("In practice, courts have applied the statute liberally") (citing Robert G. Byrd, *Misrepresentation in North Carolina*, 70 N.C. L. Rev. 323, 372 (1992)).

The prohibition on "unfairness" is "broader than and includes the concept of 'deception.'" *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980) (citation omitted). Put another way, "[w]hile an act or practice which is unfair may also be deceptive, or vice versa, it need not be so for there to be a violation of the Act." *Id.*

North Carolina courts have declined to set a limit on what conduct can qualify as unfair under the UDTPA. Instead, casting a wide net, the North Carolina courts have formulated and applied various definitions of "unfairness," all of which show how broad and fact-specific unfairness is:

- The Supreme Court has explained that "[a] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or

50

substantially injurious to consumers." *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (2007).

- "A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position." *Johnson*, 266 S.E.2d at 622.

- Unfair practices include "[c]oercive conduct." *Owens v. Pepsi Cola Bottling Co. of Hickory*, 412 S.E.2d 636, 643 (N.C. 1992).

- "[A] trade practice is unfair if the conduct undermines the ethical standards and good faith dealings between parties engaged in business transactions." *Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*, 2003 WL 22872490, at *7 (N.C. Bus. Ct. Dec. 3, 2003) (citing *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 507 S.E.2d 56, 63 (N.C. Ct. App. 1998)).

Importantly, unfairness under the UDTPA is "broader" than traditional common law tort claims. *See Bumpers v. Community Bank. of Northern Virginia*, 747 S.E.2d 220, 226 (N.C. 2013) (citation omitted).

Here, Defendants' practice of charging the Resale Fees was unfair in several respects, as Carpenter alleged in her Amended Complaint: (1) the Resale Fees were charged without a legal basis, as explained

above; (2) the fees were levied under penalty of a cancelled or delayed closing, and consumers have no choice about whether to pay them or to whom they must be paid, and therefore the fees are "coercive;" (3) the fees violated North Carolina's public policy as to the marketability of real property; (4) the fees were unfair, unethical, oppressive, unscrupulous, and substantially injurious to the consumers of the state; (5) the fact that the fees were used partially for services provided to buyers, and the fact that Defendants didn't disclose that, had the capacity and tendency to deceive; (6) the fees exceeded reasonable consumer expectations in amount and were arbitrary in amount; and (7) the cost of producing the Statements is not related to the fee charged, and the fee charged is grossly more than that cost. (JA33-34). Despite these extensive allegations, the district court considered the UDTPA only in passing.

These extensive allegations provide several different legal bases for establishing unfairness under the UDTPA. First, Defendants' Resale Fees are unfair because Carpenter and other homeowners are trapped into paying them, at the risk of not being able to sell their homes, by Defendants' abuse of their disproportionate power. Second, the Resale Fees violate state public policy, a long-recognized basis for a UDTPA

claim. Third, the Resale Fees are excessive, duplicative, and do not bear enough of a relationship to the work required to produce the Statements. Any of these is individually enough to show "unfairness under the UDTPA, especially at the motion to dismiss stage.

> **1. Defendants' practices are unfair because sellers must pay the fee in order to be able to sell their property, and they have no choice whom to pay or how much to pay.**

Carpenter does not allege only that the amount of fees charged by Defendants is unreasonable, although that is certainly true; rather, she also alleges that the Resale Fees unfairly resulted from Defendants' efforts to take advantage of homeowners' need for the Statement. Such abuse of unequal power and position is precisely the type of conduct that this Court has recognized is "unfair" for UDTPA purposes. *See S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese,* 284 F.3d 518, 535 (4th Cir. 2002) (explaining that a practice is unfair "where a party engages in conduct manifesting an inequitable assertion of power or position").

It's important to reiterate that the Resale Fees are not negotiated by Carpenter or other homeowners with Defendants. Rather, Defendants decide together what and how to charge consumers for the production of the Statements, and consumers simply have to pay that. If they do not

like it, consumers are only left with hypothetical and fanciful recourse: not selling the property, only selling the property to an all-cash buyer, or hiring a private real estate attorney to facilitate a manual title search on the property. The entire structure of the situation is inherently unfair and takes advantage of a homeowner in a captive position.

Here, Carpenter had a lot to lose if she did not pay the Resale Fees that Defendants negotiated between themselves and then demanded from her. Without the Statement, she could not sell her properties. Defendants are unfairly holding consumers like her hostage.

> ## 2. Defendants' practices are unfair because they violate the public policy against restraints on the sale of real property.

Another common basis on which to base unfairness is a violation of North Carolina public policy. *See Walker*, 653 S.E.2d at 399 (explaining that violation of public policy is a long-held basis for establishing unfairness under the UDTPA). Because it is undisputed that Chapter 39A codifies North Carolina public policy, if this Court agrees that Carpenter has stated a claim for violation of Chapter 39A, then axiomatically Carpenter has stated a claim under the UDTPA. *See, e.g.*, *Noble v. Hooters of Greenville (NC), LLC*, 681 S.E.2d 448, 454–55 (N.C.

Ct. App. 2009) (explaining how violations of other statutes can be "per se" violations of the UDTPA).

However, as explained above, the UDTPA is a gap-filler, and therefore it creates liability even when (and sometimes almost because) no other statute or common law rule creates liability. *See, e.g.*, *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 683 (N.C. 2000) (holding that a violation of one subsection of an insurance consumer protection statute, even in the absence of another element that would yield a violation of that statute, constitutes a violation of the UDTPA). The determination of unfairness under the UDTPA is fluid, and violation of public policy that is codified or exemplified in another statute can be evidence of unfairness even if the precise elements of that other statute are not satisfied.

Here, North Carolina public policy has long stood to protect the interests of its citizens related to the sale of real property. *See* N.C.G.S. § 39A-1 (stating that North Carolina's public policy "favors the marketability of real property and the transferability of interests in real property free from title defects, unreasonable restraints on alienation, and covenants or servitudes that do not touch and concern the

55

property."). At least since 1973, North Carolina's public policy has favored the free alienability and sale of land.  N.C.G.S. § 47B-1(1).

In the early 2000s, transfer fees and transfer fee covenants had become a growing problem across the country, inspiring states, including North Carolina, to prohibit such fees and covenants. *See* McEachran, *Recent Development*, *supra*, at 2201–11. North Carolina enacted Chapter 39A in 2010 specifically to limit such fees and covenants and to codify the "public policy of this State [that] favors the marketability of real property…." N.C.G.S. § 39A-1(a).

Forcing sellers to pay unreasonable fees before they can complete the sale of their property amounts to a sales penalty. Such a penalty contravenes North Carolina's public policy of favoring the marketability of real property and is therefore unfair under the UDTPA. Carpenter stated a claim under Chapter 39A, but even if she didn't meet some technical requirement for such a claim, that is where the UDTPA comes in and fills that gap.

3.   **Defendants' practices are unfair because the fees are excessive and disproportionate to the work required.**

Finally, it is important to note that, contrary to Defendants' argument below and the district court's cursory implication to the same effect, nothing in North Carolina case law precludes a UDTPA claim being based—and in this case based only *in part*—on fees being excessive. The case central to that issue is *Bumpers v. Community Bank. of Northern Virginia*, 747 S.E.2d 220, 228–29 (N.C. 2013). In *Bumpers*, the North Carolina Supreme Court analyzed whether the UDTPA "imposes a price ceiling on the fees a closing services provider may charge in connection with closing a loan." *Id.* at 222. The court in *Bumpers* declined to impose such a ceiling, focusing on the principle that parties are generally free to negotiate transactions and that their doing so, even at a financial loss to one side, is not inherently unfair or deceptive. *See id.* at 228–29 ("[W]hen transacting parties willingly and honestly negotiate a transaction, generally the transaction is not said to be unfair or deceptive.")

While there are superficial parallels between *Bumpers* and this case, the district court here did not fully engage with all of the analysis

that was central to *Bumpers*, and the underlying facts between the two cases are quite different. Perhaps most importantly, *Bumpers* itself acknowledges that "there may be circumstances…when an unreasonably excessive price would constitute a violation of [the UDTPA]." *Id.* at 229; *see also id.* at 231 (Hudson, J. dissenting) (agreeing that "the majority ultimately holds that excessive pricing *could* constitute a violation of section 75-1.1 . . .") (emphasis added). Thus, unlike what Defendants argued below, there is no categorical rule that excessive pricing cannot establish a UDTPA claim.

Moreover, the rationale in *Bumpers* for the holding that the excessive pricing in that particular case was not a basis for the UDTPA claim was that "[p]laintiffs entered into their loan transactions freely and without any compulsion." *Id.* The allegedly excessive fees in question were charged by the defendant title company, an entity that the plaintiff *chose* to assist in closing his real estate transaction and directly contracted with to do so. *Id.*

Here, there was no such choice for Carpenter. Rather, Defendants were the only entities with the power to produce the Statements she needed to sell the properties. What's more, Defendants agreed with each

other that the Statements had to be routed through HomeWise first, even though William Douglas could have provided them directly. Carpenter had no ability to refuse HomeWise's involvement in the production of the Statements. More broadly, if Carpenter wanted to sell the properties, she had to pay Defendants whatever they asked, even though the fees grossly exceeded what would be reasonable for the little work required to produce them.

Moreover, *Bumpers* cannot mean that excessive fees are never a basis for a UDTPA claim, given that Chapter 39A itself allows only "reasonable" fees for statements, and given that the recent amendments to Chapters 47C and 47F protect against unreasonably high fees for statements. It would make no sense for the General Assembly to have passed Chapter 39A and these amendments if unreasonably high fees were not a concern worthy of protection.

Finally, as to whether the Resale Fees themselves were excessive enough to establish the UDTPA claim, that is not necessary for this Court to determine right now. The Amended Complaint contains allegations that the fees were disproportionate to the work required to produce the Statements, that the fees were duplicative, that the fees were used in

part for services provided to the buyer, that they were arbitrary in amount, etc. Unlike *Bumpers*, which was on review of a summary judgment order, this case is on review of a dismissal order. If excessive pricing can possibly be a basis for a UDTPA claim (it can be), and if Carpenter raises facts and legal allegations that the pricing was excessive (she does), then the district court should not have dismissed the claim.

In *Dernoshek v. FirstService Residential, Inc.*, No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Sept. 23, 2022), the court held that the facts established in discovery—which were similar to the facts alleged here—were sufficient for the plaintiff to survive summary judgment on his UDTPA claim. The September 2022 order explains that the fees charged to the plaintiff for the preparation of statements of unpaid assessments could be unfair because the statements took only a few minutes to prepare and yet the plaintiff was charged $192 for the statement's

preparation. *Id.* at 2. That is the correct conclusion under North Carolina law.[7]

## B. Carpenter was injured by the forced payment of the Resale Fees.

Although the third element of the UDTPA claim should be uncontested, Defendants tried to argue below that Carpenter suffered no injury from the alleged violation of the UDTPA. The idea that Carpenter suffered no injury because she received what was requested when the Statements were delivered is deliberately obtuse. That argument ignores her allegations and the clear theory of this claim: that a statement of unpaid assessments is an important document for closing, that Defendants conspired to ensure that the only way to get one was through

---

[7] In December 2022, the court in *Dernoshek* reconsidered its decision, granting summary judgment to defendants on the UDTPA claim. *See Dernoshek v. FirstService Residential, Inc.*, No. 1:21-cv-00056-CCE-JLW (M.D.N.C. Dec. 8, 2022). That change, however, was based on the misguided application of a recent and unrelated case from this Court dealing with agency theory, *Thompson v. Ciox Health*, LLC, 52 F.4th 171 (4th Cir. 2022). *Dernoshek* applied *Thompson* in concluding that the Defendants here could not be liable under agency theory under the UDTPA, but *Thompson* did not involve North Carolina law at all (it is a South Carolina case), nor was the statute at issue there parallel to the UDTPA in any relevant way. *Id.* at 171–74 (addressing South Carolina's Patient Records Act). *Thompson* is irrelevant here, and *Dernoshek's* reliance on it is misplaced.

them, and that Defendants charged Carpenter duplicative and unreasonable fees. The injury that Carpenter suffered is clear: the fact that she had to pay the grossly unreasonable and excessive fees under the particular circumstances of this case.

## III. CARPENTER STATED A CLAIM FOR UNJUST ENRICHMENT.

Unjust enrichment is an equitable doctrine that provides relief in situations where "benefits [were] received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 315 S.E.2d 759, 761, aff'd, 321 S.E.2d 892 (1984). The district court dismissed Carpenter's claim for unjust enrichment without any reasoning, aside from the implication that this claim cannot succeed if the Chapter 39A claim fails, but there is no support for that conclusion. *See, e.g.*, *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 665 S.E.2d 478, 485 (N.C. Ct. App. 2008) (explaining that unjust enrichment is an equitable doctrine to be applied at a court's discretion).

The primary question here is whether it would be "unjust" for Defendants to retain the benefit they received from Carpenter. Carpenter

makes many allegations showing the unjust nature of this situation, as explained above.

Defendants asserted below that this claim should be dismissed because Carpenter received the benefit that she paid for, but that does not mean it is okay for Defendants to profit off their unjust actions, and no case holds that simply receiving something of *some* value necessarily precludes an unjust enrichment claim.

One reason why it is unjust for Defendants to retain the payments is that HomeWise provided a service that was duplicative of the service provided by William Douglas. Both entities charged and collected the fee from Carpenter by leveraging the importance of the Statement and their unique status as providing the only platform to access the Statement. Furthermore, Carpenter alleged that the amount was grossly excessive and unjust compared to the value of the Statement that she did receive, and that's sufficient to state this claim. Under all of the circumstances, it would be unjust for Defendants to retain the money charged for their duplicative work.

## IV. CARPENTER STATED A CLAIM FOR VIOLATION OF THE NORTH CAROLINA DEBT COLLECTION ACT, NEGLIGENT MISREPRESENTATION, AND CIVIL CONSPIRACY.

### A. Carpenter stated a claim that Defendants violated the North Carolina Debt Collection Act.

To state a claim under the North Carolina Debt Collection Act, N.C.G.S. § 75-50 *et seq.* ("NCDCA"), a plaintiff must allege that: (1) she is a consumer, (2) the amount owed is a debt, and (3) defendants are debt collectors. Carpenter's Complaint sufficiently alleges these things.

The district court dismissed Carpenter's NCDCA claim without any substantive reasoning, aside from asserting that this claim depends on the Chapter 39A claim. That's true, but Carpenter has stated the Chapter 39A claim, as explained above.

In the court below, Defendants' other cursory argument on this claim was merely that Defendants were not involved in the collection of a debt. That ignores Carpenter's allegations that Defendants sent invoices to Carpenter to collect money that Defendants allege they were owed. (JA14, JA37). Those allegations also describe Defendants' plan to charge duplicative, unreasonable, and unlawful fees to Carpenter. Thus, Carpenter has stated this claim.

## B. Carpenter stated a claim for negligent misrepresentation.

In North Carolina, "the tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d 465, 478 (2009).

The district court summarily dismissed this claim without much analysis, stating only that the Amended Complaint does not demonstrate that the fees were not lawfully owed. (JA91). That ignores Carpenter's allegations. The Amended Complaint makes clear that Defendants "invoice homeowners directly together" and that "Defendants provide statements of unpaid assessments," which are representations. (JA14). Carpenter also alleges that she paid the Resale Fees in response to an invoice presented by HomeWise, showing reliance. Most importantly, Carpenter alleges that the Resale Fees were unlawful in two respects: (1) they are unlawful as unreasonable transfer fees under Chapter 39A, and (2) they are unlawful because they are unfair under the UDTPA. Either of these supports the allegation that Defendants "made material [mis]representations . . . that the fee charged for the preparation of statements of unpaid assessments was lawfully owed." (JA35).

Defendants' argument below that Carpenter engaged in "group pleading" by pleading against both defendants, and therefore failed to satisfy the pleading requirements, is incorrect. (*See* JA11-13 (explaining role of William Douglas) and JA13-14 (explaining role of HomeWise)). That argument also misses the point: part of what is unfair about this situation is that Defendants act together in concert to exert power over Carpenter.

## C.    Carpenter stated a claim for civil conspiracy.

In North Carolina, a claim for civil conspiracy exists when there is an agreement between two or more persons to do an unlawful act or to perform lawful acts in an unlawful way that results in damage to the claimant. *Boyd v. Drum*, 501 S.E.2d 91, 96 (N.C. Ct. App. 1998), *aff'd* 511 S.E.2d 304 (1999). The district court summarily dismissed Carpenter's claim for civil conspiracy, on the grounds that every other claim on which it relies fails.

For the reasons stated above, Defendants' actions are unlawful for multiple reasons, including under Chapter 39A, North Carolina's UDTPA, and the doctrine of unjust enrichment. Carpenter's claim for civil conspiracy should survive if any of her other claims survive, and

they do. And Carpenter has plausibly alleged that Defendants had an agreement to perform those unlawful acts, which damaged Carpenter. Thus, the civil conspiracy claim should not have been dismissed.

## CONCLUSION

The fees Defendants charged Carpenter and others in the class are inescapable and excessive. Unless they pay whatever Defendants demand, Carpenter and other North Carolinians are kept from selling their homes. That is obviously unfair, but more importantly it's illegal under North Carolina law. This Court should reverse.

## REQUEST FOR ORAL ARGUMENT

Carpenter respectfully requests oral argument because the issues of law are complex and hotly-contested in this case.

Respectfully submitted this 4th day of January, 2023.

/s/ Mark R. Sigmon
Mark R. Sigmon, N.C. Bar No. 37762
Scott C. Harris, N.C. Bar No. 35328
Patrick Wallace, N.C. Bar No. 48138
Jeremy Williams, N.C. Bar No. 48162
MILBERG     COLEMAN     BRYSON
PHILLIPS GROSSMAN, PLLC
900 West Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5003
Fax:     (919) 600-5035
Email: msigmon@milberg.com
Email: sharris@milberg.com
Email: pwallace@milberg.com
Email: jwilliams@milberg.com

*Counsel for Plaintiff-Appellant Carpenter*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*12,965*] words.

[   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Century Schoolbook*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 4, 2023</u>        <u>/s/ Mark R. Sigmon</u>
                                  *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 4th day of January, 2023, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jeffrey B. Kuykendal
MCANGUS, GOUDELOCK & COURIE, LLC
Post Office Box 30307
Charlotte, North Carolina  28230
(704) 643-6303

*Counsel for Appellee*
  *William Douglas Management, Inc.*

Steven A. Meckler
Frederick M. Thurman, Jr.
SHUMAKER LOOP & KENDRICK, PLLC
101 South Tryon Street, Suite 2200
Charlotte, North Carolina  28280
(704) 945-2187

Philip M. Oliss
Alexander W. Prunka
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio  44114
(216) 586-7164

*Counsel for Appellee*
  *NextLevel Association Solutions, Inc.*

/s/ Mark R. Sigmon
*Counsel for Appellant*